NORTHWEST AIRLINES, INC. *v.* TRANSPORT WORK-
ERS UNION OF AMERICA, AFL–CIO, ET AL.

No. 79–1056.   Argued December 2, 1980—Decided April 20, 1981

STEVENS, J., delivered the opinion of the Court, in which all other Members joined, except BLACKMUN, J., who took no part in the consideration or decision of the case.

*Philip A. Lacovara* argued the cause for petitioner. With him on the briefs were *Jay Kelly Wright* and *Gerald Goldman.*

*Stephen B. Moldof* argued the cause for respondents and filed a brief for respondent Air Line Pilots Association, International. *Asher W. Swartz* filed a brief for respondent Transport Workers Union of America, AFL–CIO.

*Deputy Solicitor General Wallace* argued the cause for the United States et al. as *amici curiae.* With him on the brief were *Solicitor General McCree, Harlon L. Dalton,* and *Leroy D. Clark.**

**J. Albert Woll, Laurence Gold, John Fillion,* and *George Kaufmann* filed a brief for the American Federation of Labor and Congress of Industrial Organizations et al. as *amici curiae* urging affirmance.

Briefs of *amici curiae* were filed by *Herbert Prashker, Peyton H. Moss,*

Justice Stevens delivered the opinion of the Court.

The question presented in this case is whether an employer held liable to its female employees for backpay because collectively bargained wage differentials were found to violate the Equal Pay Act of 1963 [1] and Title VII of the Civil Rights Act of 1964 [2] has a federal statutory or common-law right to

and *Eric D. Witkin* for Trans World Airlines, Inc.; by *Winn I. Newman, Carole Wilson, Richard B. Sobol,* and *Michael B. Trister* for the International Union of Electrical, Radio, and Machine Workers, AFL–CIO; and by *Michael H. Gottesman* and *Robert M. Weinberg* for Mary P. Laffey et al.

[1] The Equal Pay Act, 77 Stat. 56, 29 U. S. C. § 206 (d), which was enacted in 1963 as an amendment to the Fair Labor Standards Act, 52 Stat. 1060, 29 U. S. C. § 201 *et seq.,* provides, in relevant part:

"(d) (1) No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex: *Provided,* That an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee.

"(2) No labor organization, or its agents, representing employees of an employer having employees subject to any provisions of this section shall cause or attempt to cause such an employer to discriminate against an employee in violation of paragraph (1) of this subsection." 29 U. S. C. §§ 206 (d) (1)–(2).

[2] Section 703 of the Civil Rights Act, 78 Stat. 255, as amended and as set forth in 42 U. S. C. § 2000e–2, provides, in relevant part:

"(a) . . . It shall be an unlawful employment practice for an employer—

"(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compen-

contribution from unions that allegedly bear at least partial responsibility for the statutory violations.

The relevant facts are alleged in the complaint filed by the petitioner, Northwest Airlines, Inc., against the respondent unions, the Transport Workers Union of America (TWU) and the Air Line Pilots Association, International (ALPA), in the United States District Court for the District of Columbia.[3]   Continuously from 1947 through 1974, petitioner paid higher wages to its. male cabin attendants, who were classi-

---

sation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

"(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

.        .        .        .        .

"(c)  . . . It shall be an unlawful employment practice for a labor organization—

"(1) to exclude or to expel from its membership, or otherwise to discriminate against, any individual because of his race, color, religion, sex, or national origin;

"(2) to limit, segregate, or classify its membership or applicants for membership, or to classify or fail or refuse to refer for employment any individual, in any way which would deprive or tend to deprive any individual of employment opportunities, or would limit such employment opportunities or otherwise adversely affect his status as an employee or as an applicant for employment, because of such individual's race, color, religion, sex, or national origin; or

"(3) to cause or attempt to cause an employer to discriminate against an individual in violation of this section."   42 U. S. C. §§ 2000e–2 (a), (c).

[3] Because the case comes before us on respondents' motions to dismiss, we accept as true the factual allegations of petitioner's complaint. See *Scheuer* v. *Rhodes,* 416 U. S. 232, 236–237.   Additional background information is taken from the District Court and Court of Appeals opinions in the underlying employment discrimination class action. See *Laffey* v. *Northwest Airlines, Inc.,* 366 F. Supp. 763 (1973), aff'd in part, vacated and remanded in part, 185 U. S. App. D. C. 322, 567 F. 2d 429 (1976), cert. denied, 434 U. S. 1086.

fied as pursers, than to its female cabin attendants, who were classified as stewardesses. During that period, both the male and the female cabin attendants were represented by a union—TWU from 1961 to 1971 and ALPA thereafter[4]—and their wages were fixed by collective-bargaining agreements negotiated and executed in response to union demands.

In 1970, Mary Laffey, a female cabin attendant employed by petitioner, commenced a class action against petitioner challenging the legality of the wage differential between pursers and stewardesses.[5] On November 12, 1973, after a full trial, the District Court issued an opinion in which it found that the two positions required equal skill, effort, and responsibility, and were performed under similar working conditions. Accordingly, the court held that petitioner had violated the Equal Pay Act and Title VII of the Civil Rights Act of 1964 and entered judgment in favor of the plaintiff class. *Laffey* v. *Northwest Airlines, Inc.*, 366 F. Supp. 763 (1973).[6] Unless that judgment is reversed or modified, peti-

---

[4] From 1946 to 1961, the cabin attendants were represented by the Airline Stewards and Stewardesses Association, International, which became affiliated with TWU in 1961. See *Laffey* v. *Northwest Airlines, Inc.*, 366 F. Supp., at 765. Prior to 1947, all cabin attendants employed by petitioner were females classified as stewardesses. *Ibid.*

[5] No claims were asserted against the respondent unions, although the plaintiffs subsequently joined ALPA as a nonaligned party under Federal Rule of Civil Procedure 19 (a) in order to bring before the District Court all parties necessary to implement a complete remedy. See *Laffey* v. *Northwest Airlines, Inc.*, 185 U. S. App. D. C., at 370–371, 567 F. 2d, at 477–478. The plaintiffs expressly stated that they did not consider ALPA responsible for any of the alleged discrimination, and petitioner did not oppose ALPA's participation as a nonaligned party. *Id.*, at 371, 567 F. 2d, at 478.

[6] Shortly thereafter, the District Court entered an order detailing the remedial steps, including payment of backpay, that petitioner was to take to rectify its past discrimination. *Laffey* v. *Northwest Airlines, Inc.*, 374 F. Supp. 1382 (1974).

tioner will be required to pay in excess of $20 million in back-pay, damages, and interest to the members of the *Laffey* plaintiff class.[7]

After the entry of judgment against it, petitioner filed appropriate motions in the *Laffey* case asserting claims for contribution and indemnification against TWU and ALPA.[8] Those motions were denied as untimely, and the Court of Appeals affirmed this ruling. *Laffey v. Northwest Airlines, Inc.,* 185 U. S. App. D. C. 322, 369–370, 567 F. 2d 429, 476–478. Promptly thereafter, petitioner commenced this separate action. The complaint prayed that each union be adjudged liable to pay a proportion of any monetary liability finally assessed against petitioner in the *Laffey* litigation. The unions moved to dismiss the complaint for failure to state a claim upon which relief could be granted.

As the District Court interpreted the pleadings, petitioner contended that it had an implied cause of action against the unions under the Equal Pay Act for causing it to discriminate against the *Laffey* class, or, in the alternative, a federal common-law right to contribution from the unions for a share of its Equal Pay Act monetary liability. Petitioner's claim for reimbursement for its Title VII monetary liability was based solely on a federal common-law right to contribution. App. to Pet. for Cert. 2b–3b. The District Court held that because the Equal Pay Act clearly was not enacted for the spe-

[7] The opinion of the District Court in the present case indicates that petitioner's monetary liability as a result of the *Laffey* litigation has been estimated to be $24,500,000. App. to Pet. for Cert. 11b, n. 23. Petitioner in this Court asserts that its monetary liability presently is calculated to be approximately $37 million. Brief for Petitioner 6.

[8] Petitioner moved to amend its answer to include a request that ALPA be realigned as a defendant and to assert a cross-claim for contribution or indemnification from ALPA for any Equal Pay Act or Title VII monetary liability assessed against petitioner and a claim for damages under the Equal Pay Act for allegedly causing petitioner's violation. Petitioner also moved for leave to file a third-party complaint against TWU asserting similar claims.

cial benefit of employers, petitioner could not rely upon an implied private cause of action for contribution under that statute. The court also concluded that the Act did not afford employees any express or implied right of action against their unions; because it found that unions and employers do not share common liability to employees under the Equal Pay Act, the District Court held that there is no federal common-law right to contribution for liability under that statute.[9]

The District Court reached a different conclusion with respect to the claim for contribution for petitioner's Title VII monetary liability. It found that the allegations of the complaint satisfied the two principal elements of a common-law right to contribution: (1) common liability and (2) the party seeking contribution has been required to pay more than its just share of the award. *Id.*, at 10b. The court answered what it described as the "more difficult question" whether there is a right to contribution under federal law by noting a modern trend of federal-court decisions favoring contribution,[10] and by finding that the policy of the statute would

---

[9] Most of the lower federal courts that have considered the question whether employers may seek contribution from unions for monetary liability under the Equal Pay Act have concluded that this right is not implicit in the statute nor available under federal common law. See, *e. g.,* *Denicola* v. *G. C. Murphy Co.,* 562 F. 2d 889 (CA3 1977); *EEOC* v. *Ferris State College,* 493 F. Supp. 707 (WD Mich. 1980); *Marshall* v. *Tombs Janitorial Service, Inc.,* 82 CCH LC ¶ 33,559 (WD Mo. 1977); *Usery* v. *Beloit College,* 12 EPD ¶ 11,203 (WD Wis. 1976); *Brennan* v. *Emerald Renovators, Inc.,* 410 F. Supp. 1057 (SDNY 1975). But see *Love* v. *Temple University,* 366 F. Supp. 835 (ED Pa. 1973); *Wirtz* v. *Hayes Industries, Inc.,* 1 EPD ¶ 9874 (ND Ohio 1968).

[10] As the District Court explained:

"The more difficult question is whether there is a right to contribution under federal law. The traditional American rule, originating in the English case of *Merryweather* v. *Nixan,* was that there was no right to contribution between joint tortfeasors. This rule has been abrogated in most states, principally by statute although a few jurisdictions, includ-

be served by allowing contribution. Assuming, without deciding, that contribution might be denied for an intentional wrong, the court denied the unions' motions to dismiss, holding "only that there is a federal common law right to contribution for monetary liability imposed under Title VII, at least under some circumstances, and it will reach the questions as to the precise parameters of this right when the pertinent facts have been developed and properly placed before the Court." *Id.*, at 18b.[11]

---

ing the District of Columbia, have done so by decisional law. As with state law, there was initially no right to contribution under federal law, absent legislation. *Union Stock Yards Co.* v. *Chicago, B & Q R. Co.*, 196 U. S. 217, 224 (1905). However, the modern trend, as evidenced by cases such as *Kohr* v. *Allegheny Airlines, Inc.*, 504 F. 2d 400 (7th Cir. 1974), *cert. denied*, 421 U. S. [978] (1975), has been to recognize a right to contribution under federal law. *Gould* v. *American-Hawaiian Steamship Company*, 387 F. Supp. 163, 169 (D. Del. 1974), *vacated on other grounds*, 535 F. 2d 761 (3rd Cir. 1976). The federal courts have come to realize that the policy considerations upon which the traditional rule was built are archaic and lead to inequities. Indeed, the most extensive body of law evidencing a significant trend toward fashioning a federal common law right to contribution concerns contribution for back pay awarded under Title VII." App. to Pet. for Cert. 11b–12b (footnotes omitted).

[11] The weight of authority in the lower federal courts supports the District Court's conclusion that a right to contribution is available to employers found liable for backpay under Title VII. See, *e. g.*, *Glus* v. *G. C. Murphy Co.*, 629 F. 2d 248 (CA3 1980), cert. pending, No. 80–461; *Stevenson* v. *International Paper Co.*, 432 F. Supp. 390 (WD La. 1977); *International Union of Electrical, Radio, and Machine Workers* v. *Westinghouse Electric Corp.*, 73 F. R. D. 57 (WDNY 1976); *Grogg* v. *General Motors Corp.*, 72 F. R. D. 523 (SDNY 1976); *Lynch* v. *Sperry Rand Corp.*, 62 F. R. D. 78 (SDNY 1973); *Gilbert* v. *General Electric Co.*, 59 F. R. D. 267 (ED Va. 1973); *Osborne* v. *McCall Printing Co.*, 4 FEP Cases 276 (SD Ohio 1972); *Torockio* v. *Chamberlain Mfg. Co.*, 51 F. R. D. 517 (WD Pa. 1970); *Blanton* v. *Southern Bell Telephone & Telegraph Co.*, 49 F. R. D. 162 (ND Ga. 1970); *Bowe* v. *Colgate-Palmolive Co.*, 272 F. Supp. 332 (SD Ind. 1967), aff'd in part and rev'd in part, 416 F. 2d 711 (CA7 1969). But see *Younger* v. *Glamorgan Pipe & Foundry Co.*, 418 F. Supp. 743 (WD Va. 1976), vacated on other grounds, 561 F. 2d 563 (CA4 1977); *Harden* v. *Illinois Bell*

The unions took an interlocutory appeal from the Title VII holding,[12] and petitioner appealed the Equal Pay Act holding.[13] The Court of Appeals affirmed the dismissal of the claim for contribution based on petitioner's liability under the Equal Pay Act, reasoning that such a claim would be inconsistent with the statutory scheme prescribing three, and only three, modes of enforcement.[14] However, the Court of Appeals declined to reach the Title VII issue. Noting that on appeal the unions had asserted for the first time that petitioner's Title VII contribution claim was barred by laches, the court remanded to the District Court with in-

---

*Telephone Co.,* No. 74 C 1505 (ND Ill., Apr. 8, 1975). Cf. *Communication Workers of America* v. *Illinois Bell Telephone Co.,* 12 EPD ¶ 11,275 (ND Ill. 1976).

[12] The District Court entered an appropriate order under 28 U. S. C. § 1292 (b), and the Court of Appeals allowed the interlocutory appeal.

[13] The District Court made the findings required by Rule 54 (b) of the Federal Rules of Civil Procedure.

[14] The Court of Appeals described this statutory scheme in detail:

"It is improbable that an employee would ever have an implied cause of action under the Equal Pay Act against his union. The statutory scheme envisions three modes of enforcement and to imply a fourth would be inconsistent with the intent evidenced by the existing three. First, under section 216 (a) of title 29, U. S. Code, 'any person' who wilfully violates the Act may be subject to criminal penalties. Under section 216 (c), the Secretary of Labor may bring suit to recover money owing 'to any employee or employees.' Finally, section 216 (b) of title 29 permits suits by employees against 'any employer' who violates the Act. The statutory scheme of enforcement is comprehensive and by omission, it insulates unions from suits by employees. This statutory protection would certainly be frustrated by a declaration that an *employer* could recover from a union, once that employer had been found liable to its employees. Of course, we need not—and do not—definitely resolve the issue of an employee's right to sue a union under the Act. We hold only that the likelihood of the implication of such a right is sufficiently remote to preclude the creation of a cause of action against a union for contribution or indemnification. Such a cause of action would, in reality, create liability on the part of the union for the benefit of employees whom Congress did not intend to protect in such a manner." 196 U. S. App. D. C. 443, 448, 606 F. 2d 1350, 1355 (1979) (footnote omitted).

structions to determine the laches question, explaining that it might thereby become unnecessary to decide the hard question concerning contribution for Title VII liability. 196 U. S. App. D. C. 443, 449, 606 F. 2d 1350, 1356 (1979).

Unlike the Court of Appeals, we think the basic legal questions raised by the motions to dismiss petitioner's contribution claims are ripe for decision.[15] The importance of these questions led us to grant certiorari. 447 U. S. 920.

## I

We first put to one side certain questions that we need not address. We shall then discuss the two quite different theories that might support petitioner's claimed right to contribution.

At common law there was no right to contribution among joint tortfeasors.[16] In most American jurisdictions, however,

---

[15] As our discussion of the implied right of action and federal common-law theories will indicate, see Parts II and III, *infra*, we find that the same legal questions are presented by both the Equal Pay Act and Title VII contribution claims. Because the same analysis is applicable to both claims, we address the Title VII question despite the Court of Appeals' decision to avoid consideration of that question on the merits. See *Minnesota* v. *Clover Leaf Creamery Co.*, 449 U. S. 456, 470–471, n. 14; *New York City Transit Authority* v. *Beazer*, 440 U. S. 568, 583–584, n. 24. It should be noted that the reasons for avoiding the unnecessary or premature decision of constitutional questions are not necessarily applicable to the decision of statutory questions. For if an interpretation of a statute misapprehends the actual intent of Congress or is proved by experience to have been unwise, remedial legislation can be promptly enacted.

[16] The no-contribution rule of the common law is generally traced to *Merryweather* v. *Nixan*, 8 Term Rep. 186, 101 Eng. Rep. 1337 (K. B. 1799). However, scholars have persuasively argued that *Merryweather* cannot be read to establish a general rule prohibiting contribution among joint tortfeasors; rather, they interpret *Merryweather* to announce only a rule barring contribution in cases of intentional wrongdoing. See, *e. g.*, W. Prosser, Law of Torts § 50, pp. 305–306 (4th ed. 1971); Sullivan, New Perspectives in Antitrust Litigation: Towards a Right of Comparative Contribution, 1980 U. Ill. Law Forum 389, 392–393. Nevertheless, be-

that rule has been changed either by statute or by judicial decision.[17] Typically, a right to contribution is recognized when two or more persons are liable to the same plaintiff for

cause most American courts understood *Merryweather* as a general proscription of contribution, the common law in this country traditionally prohibited contribution among joint tortfeasors in all cases. See *Union Stock Yards Co.* v. *Chicago B. & Q. R. Co.*, 196 U. S. 217.

[17] Thirty-nine States and the District of Columbia recognize to some extent a right to contribution among joint tortfeasors. In 10 jurisdictions, the common-law rule was initially changed by judicial action. See *George's Radio, Inc.* v. *Capital Transit Co.*, 75 U. S. App. D. C. 187, 126 F. 2d 219 (1942); *Skinner* v. *Reed-Prentice Div. Package Machinery Co.*, 70 Ill. 2d 1, 374 N. E. 2d 437 (1977); *Best* v. *Yerkes*, 247 Iowa 800, 77 N. W. 2d 23 (1956); *Quatray* v. *Wicker*, 178 La. 289, 151 So. 208 (1933); *Bedell* v. *Reagan*, 159 Me. 292, 192 A. 2d 24 (1963); *Underwriters at Lloyds* v. *Smith*, 166 Minn. 388, 208 N. W. 13 (1926); *Royal Indemnity Co.* v. *Aetna Casualty & Surety Co.*, 193 Neb. 752, 229 N. W. 2d 183 (1975); *Goldman* v. *Mitchell-Fletcher Co.*, 292 Pa. 354, 141 A. 231 (1928); *Davis* v. *Broad Street Garage*, 191 Tenn. 320, 232 S. W. 2d 355 (1950); *Ellis* v. *Chicago & N. W. R. Co.*, 167 Wis. 392, 167 N. W. 1048 (1918). Four of these States later adopted contribution statutes. See La. Civ. Code Ann., Arts. 2100–2105 (West 1977); Pa. Stat. Ann., Tit. 42, §§ 8321–8327 (Purdon Supp. 1980); Tenn. Code Ann. §§ 23–3101 to 23–3106 (Supp. 1979); Wis. Stat. §§ 113.01–113.11 (1977). The remaining States relied upon legislative action to change the common-law rule. See Alaska Stat. Ann. §§ 09.16.010 to 09.16.060 (1980); Ark. Stat. Ann. §§ 34–1001 to 34–1009 (1962); Cal. Civ. Proc. Code Ann. §§ 875–880 (West 1980 and Supp. 1981); Colo. Rev. Stat. §§ 13–50.5–101 to 13–50.5–106 (Supp. 1980); Del. Code Ann., Tit. 10, §§ 6301–6308 (1975); Fla. Stat. § 768.31 (Supp. 1979); Ga. Code § 105–2012 (1978); Haw. Rev. Stat. §§ 663–11 to 663–17 (1976); Idaho Code §§ 6–803 to 6–806 (1979); Kan. Stat. Ann. § 60–2413 (1976); Ky. Rev. Stat. §§ 412.010–412.060 (1972); Md. Ann. Code, Art. 50, §§ 16–24 (1979); Mass. Gen. Laws Ann., ch. 231B, §§ 1–4 (West Supp. 1981); Mich. Comp. Laws Ann. §§ 600.-2925a–600.2925d (West Supp. 1980–1981); Miss. Code Ann. § 85–5–5 (1972); Mo. Rev. Stat. § 537.060 (1978); Nev. Rev. Stat. §§ 17.225–17.305 (1979); N. J. Stat. Ann. §§ 2A:53A–1 to 2A:53A–5 (West 1952); N. M. Stat. Ann. §§ 41–3–1 to 41–3–8 (1978); N. Y. Civ. Prac. Law §§ 1401–1404 (McKinney 1976); N. C. Gen. Stat. §§ 1B–1 to 1B–6 (1969); N. D. Cent. Code §§ 32–38–01 to 32–38–04 (1976); Ore. Rev. Stat. §§ 18.440–18.460 (1979); R. I. Gen. Laws §§ 10–6–1 to 10–6–11

the same injury and one of the joint tortfeasors has paid more than his fair share of the common liability.[18] Recognition of the right reflects the view that when two or more persons share responsibility for a wrong, it is inequitable to require one to pay the entire cost of reparation, and it is sound policy to deter all wrongdoers by reducing the likelihood that any will entirely escape liability.[19]

In this case, we assume that all of the elements of a typical contribution claim are established. This means that we assume that the plaintiffs in the *Laffey* litigation could have recovered from either the union or the employer, under both the Equal Pay Act and Title VII,[20] and that it is unfair to

---

(1969 and Supp. 1980); S. D. Comp. Laws Ann. §§15–8–11 to 15–8–22 (1967); Tex. Rev. Civ. Stat. Ann., Art. 2212a, § 2 (Vernon Supp. 1980–1981); Utah Code Ann. §§ 78–27–39 to 78–27–43 (1977); Va. Code §§ 8.01–34, 8.01–35.1 (1977 and Supp. 1980); W. Va. Code § 55–7–13 (1981); Wyo. Stat. §§ 1–1–110 to 1–1–113 (1977).

[18] See Restatement (Second) of Torts § 886A (1979); Prosser, *supra*, at 307–309.

[19] See *Judson* v. *Peoples Bank & Trust Co.*, 17 N. J. 67, 88–89, 110 A. 2d 24, 34 (1954); Prosser, *supra*, § 50.

[20] Implicit in this assumption are two other important assumptions. First, we assume, as alleged in the complaint, that the unions are in fact at least partially responsible for the Equal Pay Act and Title VII violations established in the *Laffey* litigation. Second, we assume that the *Laffey* plaintiffs, if they had so chosen, could have asserted a claim for monetary relief against their unions under both the Equal Pay Act and Title VII. Title VII expressly provides for such private actions. See 42 U. S. C. §§ 2000e–5 (f), 2000e–5 (g). However, the Equal Pay Act does not expressly create such a right of action, and the lower federal courts have generally refused to find that the Act implicitly created this right. See, *e. g.*, *Tuma* v. *American Can Co.*, 367 F. Supp. 1178 (NJ 1973). Cf. *Hodgson* v. *Sagner, Inc.*, 326 F. Supp. 371 (Md. 1971), aff'd, 462 F. 2d 180 (CA4 1972).

The Court of Appeals in this case relied upon the uncertain availability of such a remedy under the Equal Pay Act as a basis for rejecting petitioner's claim for contribution. *196 U. S. App. D. C.*, at 447–449, 606 F. 2d, at 1354–1356. The availability of this implied remedy, however, is relevant primarily to the question whether the elements of a contribution

require petitioner to pay the entire judgment. Furthermore, although the adversaries disagree with respect to whether recognition of a right to contribution would undermine or advance the policies of the Equal Pay Act and Title VII— and, indeed, the Equal Employment Opportunity Commission has staunchly argued both sides of that policy question at different stages of this litigation [21]—we assume that the policy considerations favor the recognition of the right.

---

claim have been established; if no right to contribution exists at all, it is irrelevant that the elements of a traditional contribution claim may or may not have been established in this case. Because we conclude that no right to contribution exists under either the statute or the federal common law, we need not decide whether the elements of a contribution claim have been established in this case. Therefore, we need not and do not decide the question whether employees have an implied right of action for back-pay against their unions for violations of the Equal Pay Act.

[21] The EEOC filed a brief as *amicus curiae* in the Court of Appeals arguing as follows:

"Recognizing a right to contribution for Title VII liability against a person who was not named in an EEOC charge is fully consistent with the substantive and remedial policies of the statute. . . .

". . . Permitting a party to assert a contribution claim against another who has violated the Title, where that person was not named in a charge through inadvert[e]nce or design, manifestly serves the primary, prophylactic purpose of Title VII.

.      .      .      .      .

"It cannot be inferred that claims for contribution constitute an exception to this policy, because there is no necessary inconsistency between the statutory scheme of Title VII and the assertion of a right to contribution for Title VII liability. This is because an employer seeking contribution is not asserting that it has been injured by conduct unlawful under the statute, but rather it is asserting an equitable claim to reimbursement, enforced at common law, from another wrongdoer who shares common liability." Brief for EEOC as *Amicus Curiae* in No. 78–1056 (CADC), pp. 12–14.

In this Court, however, the EEOC argues as follows:

"Contribution would undermine the policies, and interfere with enforcement, of the Equal Pay Act. . . . For somewhat different reasons, contribution would undermine the policies, and interfere with enforcement, of Title VII." Brief for United States and EEOC as *Amici Curiae* 5.

And, as argued by petitioner, we assume that the respondent unions in this case, as well as other unions in other industries,[22] bear significant responsibility for discriminatory practices that these statutes were designed to prohibit. Finally, we assume that there are circumstances in which an employer may be a "person aggrieved" by union conduct that would be remediable after a timely charge is filed against the union under § 706 (b) of Title VII, 42 U. S. C. § 2000e–5 (b).[23] None of these assumptions, however, provides a sufficient basis for recognizing the right petitioner is asserting in this proceeding.

That right may have been created in either of two ways. First, it may have been created by statute when Congress enacted the Equal Pay Act or Title VII. Even though Congress did not expressly create a contribution remedy, if its intent to do so may fairly be inferred from either or both statutes, an implied cause of action for contribution could be recognized on the basis of the analysis used in cases such as *Cort* v. *Ash,* 422 U. S. 66, *Cannon* v. *University of Chicago,* 441 U. S. 677, and *Universities Research Assn., Inc.* v. *Coutu,* 450 U. S. 754. Second, a cause of action for contribution may have become a part of the federal common law through the exercise of judicial power to fashion appropriate remedies for unlawful conduct. See, *e. g., Kohr* v. *Allegheny Airlines, Inc.,*

---

[22] See *Steelworkers* v. *Weber,* 443 U. S. 193, 198, and n. 1; Note, Union Liability for Employer Discrimination, 93 Harv. L. Rev. 702 (1980).

[23] The federal courts that have recognized a right to contribution under Title VII are divided with respect to whether that right may be asserted against a union that has not been named in a charge filed with the EEOC. Compare *Osborne* v. *McCall Printing Co.,* 4 FEP Cases 276 (SD Ohio 1972); *Blanton* v. *Southern Bell Telephone & Telegraph Co.,* 49 F. R. D. 162 (ND Ga. 1970); *Torockio* v. *Chamberlain Mfg. Co.,* 51 F. R. D. 517 (WD Pa. 1970), with *Stevenson* v. *International Paper Co.,* 432 F. Supp. 390 (WD La. 1977); *Bowe* v. *Colgate-Palmolive Co.,* 416 F. 2d 711 (CA7 1969). Cf. *Gilbert* v. *General Electric Co.,* 59 F. R. D. 267 (ED Va. 1973).

504 F. 2d 400 (CA7 1974), cert. denied, 421 U. S. 978.  For somewhat different reasons, we reject both theories.

## II

In determining whether a federal statute that does not expressly provide for a particular private right of action nonetheless implicitly created that right, our task is one of statutory construction.  See *Touche Ross & Co.* v. *Redington,* 442 U. S. 560, 568.  The ultimate question in cases such as this is whether Congress intended to create the private remedy— for example, a right to contribution—that the plaintiff seeks to invoke.  See *Transamerica Mortgage Advisors, Inc.* v. *Lewis,* 444 U. S. 11, 15–16; *Universities Research Assn., Inc., supra,* at 770.  Factors relevant to this inquiry are the language of the statute itself, its legislative history, the underlying purpose and structure of the statutory scheme, and the likelihood that Congress intended to supersede or to supplement existing state remedies.  See *Cort* v. *Ash, supra,* at 78; *Cannon, supra,* at 689–709.

In matters of statutory construction, it is appropriate to begin with the language of the statute itself.  See *Touche Ross & Co., supra,* at 568; *Reiter* v. *Sonotone Corp.,* 442 U. S. 330, 337.  Neither the Equal Pay Act nor Title VII expressly creates a right to contribution in favor of employers.  This omission, although significant,[24] is not dispositive if, among other

---

[24] Congress expressly provided for contribution among joint wrongdoers in the Securities Act of 1933, see 15 U. S. C. § 77k (f), and in the Securities Exchange Act of 1934, see 15 U. S. C. §§ 78i (e), 78r (b).  Thus, at least in these instances, when Congress wanted to provide a right to contribution, it did so expressly.

A number of federal courts have recognized an implied right to contribution under the securities laws where the underlying liability resulted from an implied private right of action.  These courts have reasoned that because Congress expressly created a right to contribution to correspond to certain express civil remedies, contribution should also be permitted when liability is based on an implied civil remedy.  See, *e. g., Heizer Corp.* v. *Ross,* 601 F. 2d 330 (CA7 1979); *Globus, Inc.* v. *Law Research Service,*

things, the language of the statutes indicates that they were enacted for the special benefit of a class of which petitioner is a member. See *Cannon, supra,* at 689. However, as the District Court correctly perceived, it cannot possibly be said that employers are members of the class for whose especial benefit either the Equal Pay Act or Title VII was enacted. App. to Pet. for Cert. 5b.[25] To the contrary, both statutes are expressly directed against employers; Congress intended in these statutes to regulate their conduct for the benefit of employees.[26] In light of this fact, petitioner "can scarcely lay claim to the status of 'beneficiary' whom Congress considered in need of protection." *Piper* v. *Chris-Craft Industries, Inc.,* 430 U. S. 1, 37.

Even if we focus upon the isolated provisions in each statute that arguably were intended to provide special protection

---

*Inc.,* 318 F. Supp. 955 (SDNY 1970), aff'd, 442 F. 2d 1346 (CA2 1971), cert. denied, 404 U. S. 941. Whatever the merit of this reasoning, a question we do not now address, these decisions provide no support for petitioner in this case.

[25] The Court of Appeals rejected the District Court's literal application of the first *Cort* v. *Ash* factor, finding it inappropriate for evaluation of a contribution claim. 196 U. S. App. D. C., at 447, 606 F. 2d, at 1354. Rather than focusing on the rights conferred upon employers by the Equal Pay Act, the court reasoned that the proper inquiry was to determine whether employees could bring suit against their unions under this statute. Viewed in this light, the first *Cort* factor was easily satisfied in this case; employees clearly were within the class for whose especial benefit the Equal Pay Act was enacted. 196 U. S. App. D. C., at 447-448, 606 F. 2d, at 1354-1355. However, this analysis confuses the question whether the elements of a contribution claim—in particular, common liability—are established in a given case, with the question whether Congress intended that contribution should be available under any circumstances. See n. 20, *supra.* The Court of Appeals erred in this case because it failed to focus on whether the party seeking to invoke the implied remedy is a member of a class that Congress intended to benefit.

[26] Indeed, inasmuch as petitioner was found guilty in the *Laffey* litigation of discrimination in violation of these statutes, it is a member of the *precise* class Congress intended to regulate.

for employers,[27] the same result follows. For those provisions, construed most favorably to petitioner, could at most provide a basis for implying a remedy for harm to an employer caused by union wrongdoing. Such a remedy for a violation of the employer's rights would be entirely different from a right to compel the union to share the responsibility for a joint violation of a third party's rights. Clearly, the language of neither statute supports implication of a right to contribution in favor of employers against unions.[28]

The structure of the statutes similarly counsels against recognition of the implied right petitioner advocates in this case. The Equal Pay Act and Title VII establish comprehensive programs designed to eliminate certain varieties of employment discrimination. The statutes make express provision for private enforcement in certain carefully defined circumstances, and provide for enforcement at the instance of the Federal Government in other circumstances.[29] The comprehensive character of the remedial scheme expressly fashioned by Congress strongly evidences an intent not to

---

[27] Section 3 of the Equal Pay Act provides:

"No labor organization, or its agents, representing employees of an employer having employees subject to any provisions of this section shall cause or attempt to cause such an employer to discriminate against an employee in violation of paragraph (1) of this subsection." 29 U. S. C. § 206 (d) (2).

Section 703 (c) (3) of Title VII provides:

"(c) . . . It shall be an unlawful employment practice for a labor organization—

.            .            .            .            .

"(3) to cause or attempt to cause an employer to discriminate against an individual in violation of this section." 42 U. S. C. § 2000e-2 (c) (3).

[28] A court's broad power under § 706 (g), 42 U. S. C. § 2000e-5 (g), to fashion relief against all respondents named in a properly filed charge is not, of course, at issue in this litigation since no charge was filed against either of the respondent unions.

[29] See *Glus* v. *G. C. Murphy Co.*, 629 F. 2d, at 265 (Sloviter, J., dissenting).

authorize additional remedies.[30]   It is, of course, not within our competence as federal judges to amend these comprehensive enforcement schemes by adding to them another private remedy not authorized by Congress.

Finally, we conclude that the legislative histories of the Equal Pay Act and Title VII provide no support for petitioner's position.[31]   As the parties recognize, the legislative history of neither statute contains any reference, adverse or favorable, to contribution.   Of course, such legislative silence is often encountered in implied-right-of-action cases; it is to be expected that "the legislative history of a statute that does not expressly create or deny a private remedy will typically be equally silent or ambiguous on the question."   *Cannon,* 441 U. S., at 694.   Therefore, "the failure of Congress expressly to consider a private remedy is not inevitably inconsistent with an intent on its part to make such a remedy available."   *Transamerica Mortgage Advisors,* 444 U. S., at 18.   But unless this congressional intent can be inferred from the language of the statute, the statutory structure, or some other source, the essential predicate for implication of a private remedy simply does not exist.   In this case, we have been unable to discover any manifestation of an intent on the part of Congress to create a right to contribution in favor of employers under the Equal Pay Act and Title VII.   Accord-

---

[30] "A frequently stated principle of statutory construction is that when legislation expressly provides a particular remedy or remedies, courts should not expand the coverage of the statute to subsume other remedies." *National Railroad Passenger Corp.* v. *National Association of Railroad Passengers,* 414 U. S. 453, 458.   This principle of statutory construction applies with full force in this case.   See also *Transamerica Mortgage Advisors, Inc.* v. *Lewis,* 444 U. S. 11, 19–20.

[31] In a case in which neither the statute nor the legislative history reveals a congressional intent to create a private right of action for the benefit of the plaintiff, we need not carry the *Cort* v. *Ash* inquiry further. See *Universities Research Assn., Inc.* v. *Coutu,* 450 U. S. 754, 770–771, n. 21; *Touche Ross & Co.* v. *Redington,* 442 U. S. 560, 575–576; *id.,* at 579–580 (BRENNAN, J., concurring).

ingly, we hold that there is no implied right to contribution under those statutes.

## III

Although it is much too late to deny that there is a significant body of federal law that has been fashioned by the federal judiciary in the common-law tradition, it remains true that federal courts, unlike their state counterparts, are courts of limited jurisdiction that have not been vested with open-ended lawmaking powers. See *United States* v. *Standard Oil Co.*, 332 U. S. 301, 313. Broadly worded constitutional and statutory provisions necessarily have been given concrete meaning and application by a process of case-by-case judicial decision in the common-law tradition. The Court also has recognized a responsibility, in the absence of legislation, to fashion federal common law in cases raising issues of uniquely federal concern, such as the definition of rights or duties of the United States,[32] or the resolution of interstate controversies.[33] However, we consistently have emphasized that the federal lawmaking power is vested in the legislative, not the judicial, branch of government; therefore, federal common law is "subject to the paramount authority of Congress." *New Jersey* v. *New York*, 283 U. S. 336, 348.[34]

A narrow exception to the limited lawmaking role of the federal judiciary is found in admiralty. We consistently

---

[32] See, *e. g., Clearfield Trust Co.* v. *United States*, 318 U. S. 363, 366–367; *Miree* v. *DeKalb County*, 433 U. S. 25, 31–32; *United States* v. *Standard Oil Co.*, 332 U. S., at 316.

[33] See, *e. g., Illinois* v. *Milwaukee*, 406 U. S. 91; *Kansas* v. *Colorado*, 206 U. S. 46, 97; *Hinderlider* v. *La Plata River & Cherry Creek Ditch Co.*, 304 U. S. 92, 110.

[34] Thus, once Congress addresses a subject, even a subject previously governed by federal common law, the justification for lawmaking by the federal courts is greatly diminished. Thereafter, the task of the federal courts is to interpret and apply statutory law, not to create common law. See, *e. g., Illinois* v. *Milwaukee, supra,* at 107; *Arizona* v. *California*, 373 U. S. 546, 565–566.

have interpreted the grant of general admiralty jurisdiction to the federal courts as a proper basis for the development of judge-made rules of maritime law. See *Fitzgerald* v. *United States Lines Co.*, 374 U. S. 16, 20–21.[35] Because "the Congress has largely left to this Court the responsibility for fashioning the controlling rules of admiralty law," *id.*, at 20, "[a]dmiralty law is judge-made law to a great extent." *Edmonds* v. *Compagnie Generale Transatlantique*, 443 U. S. 256, 259. Even in admiralty, however, where the federal judiciary's lawmaking power may well be at its strongest, it is our duty to respect the will of Congress.[36]

Pursuant to our authority to fashion flexible and equitable remedies in admiralty, see *United States* v. *Reliable Transfer Co.*, 421 U. S. 397, 409, we approved a nonstatutory federal right to contribution among joint tortfeasors in *Cooper Stevedoring Co.* v. *Fritz Kopke, Inc.*, 417 U. S. 106. In that case, relying upon ancient admiralty doctrine, we held that a shipowner may obtain contribution from another tortfeasor jointly responsible for causing injury to a longshoreman. However, contrary to petitioner's argument and the understanding of some lower federal courts,[37] *Cooper Stevedoring* did not recognize a general federal right to contribution, and no such general federal right has been recognized in any other

---

[35] An analogous situation is presented under § 301 (a) of the Labor Management Relations Act, 29 U. S. C. § 185 (a). In *Textile Workers* v. *Lincoln Mills*, 353 U. S. 448, we concluded that § 301 (a) supplied a basis for federal jurisdiction over certain cases and an authorization for judicial development of substantive federal law to govern those cases.

[36] See, *e. g.*, *Edmonds*, 443 U. S., at 271–273; *Mobil Oil Corp.* v. *Higginbotham*, 436 U. S. 618, 625; *Halcyon Lines* v. *Haenn Ship Corp.*, 342 U. S. 282, 285–287; *Cooper Stevedoring Co.* v. *Fritz Kopke, Inc.*, 417 U. S. 106, 111–113.

[37] See, *e. g.*, *Glus* v. *G. C. Murphy Co.*, 629 F. 2d, at 253; *Professional Beauty Supply, Inc.* v. *National Beauty Supply, Inc.*, 594 F. 2d 1179, 1183 (CA8 1979); *Cohen* v. *United States*, 1975–1 USTC ¶ 9391, p. 86,967 (ED Mich. 1975).

decisions of this Court.[38]   Our approval of contribution in
*Cooper Stevedoring* was based on traditional admiralty doc-
trine [39] and on the power of the federal judiciary to fashion
rules of law in admiralty.   Neither of the predicates for that
decision is applicable in the present context.

The liability of petitioner for discriminating against its
female cabin attendants is entirely a creature of federal stat-
ute.   In almost any statutory scheme, there may be a need
for judicial interpretation of ambiguous or incomplete pro-
visions.   But the authority to construe a statute is funda-
mentally different from the authority to fashion a new rule
or to provide a new remedy which Congress has decided not
to adopt.   Cf. *Mobil Oil Corp.* v. *Higginbotham,* 436 U. S.
618, 625.   The presumption that a remedy was deliberately
omitted from a statute is strongest when Congress has enacted
a comprehensive legislative scheme including an integrated
system of procedures for enforcement.   Both the Equal Pay
Act and Title VII of the Civil Rights Act of 1964 are such
statutes.   The judiciary may not, in the face of such compre-
hensive legislative schemes, fashion new remedies that might
upset carefully considered legislative programs.[40]

Last Term, in *Mohasco Corp.* v. *Silver,* 447 U. S. 807, we
had occasion to consider the enforcement scheme of Title VII
with some care.   Although equitable considerations strongly
supported a nonliteral reading of the statutory provisions re-

---

[38] Of course, federal courts, including this Court, have recognized a
right to contribution under state law in cases in which state law supplied
the appropriate rule of decision. See, *e. g., United States* v. *Yellow Cab
Co.,* 340 U. S. 543; *Gomes* v. *Brodhurst,* 394 F. 2d 465 (CA3 1967).
These cases are inapposite here.

[39] As we emphasized in *Cooper Stevedoring,* the tradition of division of
damages was unique to admiralty and had been rejected at common law.
417 U. S., at 110.

[40] As *Halcyon Lines, supra,* demonstrates, even in admiralty we decline
to fashion new remedies if there is a possibility that they may interfere
with a legislative program. See *Cooper Stevedoring, supra,* at 111–113.

98

garding the time during which a claim could be asserted, see *id.*, at 827–828 (BLACKMUN, J., dissenting), we concluded that we had a duty to "respect the compromise embodied in the words chosen by Congress. It is not our place simply to alter the balance struck by Congress in procedural statutes by favoring one side or the other in matters of statutory construction." *Id.*, at 826. In this case, as in *Mohasco*, a favorable reaction to the equitable considerations supporting petitioner's contribution claim is not a sufficient reason for enlarging on the remedial provisions contained in these carefully considered statutes.[41]

Whatever may be a federal court's power to fashion remedies in other areas of the law,[42] we are satisfied that it would be improper for us to add a right to contribution to the statutory rights that Congress created in the Equal Pay Act and Title VII. The judgment of the Court of Appeals is therefore modified insofar as it fails to direct the District Court to grant

---

[41] The equitable considerations advanced by petitioner are properly addressed to Congress, not to the federal courts. Congress is best able to evaluate these policy considerations:

"[T]he claim now asserted, though the product of a law Congress passed, is a matter on which Congress has not taken a position. It presents questions of policy on which Congress has not spoken. The selection of that policy which is most advantageous to the whole involves a host of considerations that must be weighed and appraised. That function is more appropriately for those who write the laws, rather than for those who interpret them." *United States* v. *Gilman*, 347 U. S. 507, 511–513.

[42] Presently pending before us is a case presenting the question whether contribution is available under the federal antitrust laws. *Texas Industries, Inc.* v. *Radcliff Materials, Inc.*, No. 79–1144. Although that question is analogous to the question addressed in this case, we note that *Texas Industries* involves a substantially different statutory scheme. In antitrust, the federal courts enjoy more flexibility and act more as common-law courts than in other areas governed by federal statute. See *National Society of Professional Engineers* v. *United States*, 435 U. S. 679, 688.

respondent unions' motions to dismiss the complaint. Accordingly, the judgment of the Court of Appeals is affirmed in part and vacated in part.

*It is so ordered.*

JUSTICE BLACKMUN took no part in the consideration or decision of this case.