**Richard L. FREE, individually and on behalf of the Gilbert-Hodgman Salaried Employees' Profit Sharing Plan and Trust, Plaintiff-Appellee,**

v.

**Louis J. BRIODY, individually and as trustee and member of the Committee under the Gilbert-Hodgman, Inc., Salaried Employees' Profit Sharing Plan and Trust, Defendant-Appellant.**

No. 83–1187.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 22, 1983.

Decided April 25, 1984.

---

James H. Wolf, Hedberg, Tobin, Corrigan & Wolf, Edmund M. Tobin, Chicago, Ill., for defendant-appellant.

Allan Lapidus, Vedder, Price, Kaufman & Kammholz, Chicago, Ill., for plaintiff-appellee.

Before PELL, COFFEY and FLAUM, Circuit Judges.

PELL, Circuit Judge.

Defendant Briody appeals the district court's judgment holding him jointly and severally liable with co-defendant Hodgman for losses incurred by the Gilbert-Hodgman, Inc., Salaried Employees' Profit Sharing Plan (Plan) and denying Briody's cross-claim for indemnification against Hodgman. The underlying action was brought by Richard Free pursuant to the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 *et seq.* Hodgman does not appeal the judgment against him, nor does he defend against Briody's appeal from the dismissal of the cross-claim. Plaintiff Free, however, does contest Briody's right to indemnification, and so we will first consider Briody's claim that he cannot be held liable for the Plan's

losses and then his claim that he should be allowed to recoup from Hodgman any money paid to plaintiff.

## I. FACTS

The district court found the following facts to be true: Gilbert-Hodgman, Inc., was a corporation involved in the electrical contracting business. Plaintiff Free was employed by Gilbert-Hodgman from May, 1951, to November, 1979, serving as president from May, 1977, until May, 1979. Defendant Hodgman had been an officer and a shareholder of Gilbert-Hodgman since 1968, and became the sole shareholder in May, 1978. Hodgman served as president and was a controlling influence in the corporation.

In 1967 Gilbert-Hodgman established the Salaried Employees' Profit Sharing Plan and Trust. When ERISA was enacted the Plan qualified as an "employee benefit plan" within the meaning of the Act. Hodgman served as the sole trustee of the Plan until March 15, 1979. In his capacity as trustee Hodgman invested $10,000 of Plan assets in a corporation called MRC in 1975. Hodgman later recharacterized this investment as a loan to himself, but made no payments on the interest or principal. During 1977 Hodgman transferred $8,000 of Plan assets to Dennis Mirus, a purported financial advisor and investment counselor. An accountant employed by Hodgman warned him in February, 1978, to exercise greater care regarding Plan assets entrusted to Mirus and to obtain more information from Mirus.

In March of 1979 the Board of Directors of Gilbert-Hodgman amended the Plan to conform to ERISA requirements. The restated Plan required a second trustee. The Board designated Briody as the second trustee. Briody was a lifetime friend of Hodgman and did business with Hodgman in the role of an insurance agent. Briody also served as a director of several Hodgman companies, including Gilbert-Hodgman. Briody, as a director, signed a resolution naming him as second trustee on March 12, 1979. On March 15, 1979, Brio-dy and Hodgman signed the restated Plan as trustees.

On March 19, 1979, Hodgman withdrew $44,284 the Plan had invested in The Chemical Fund, Inc., and gave $40,000 to Mirus eleven days later. During the fall of 1979 three Plan participants received checks from Mirus in purported satisfaction of their accounts. The bank refused to process these checks due to insufficient funds in the Plan's account. On April 11, 1980, Hodgman withdrew the last substantial Plan asset, a $22,185 cash balance from a life insurance policy, and placed the proceeds in the Plan's checking account. Two weeks later Hodgman withdrew $21,327 from the Plan's account to satisfy obligations of Gilbert-Hodgman. Briody's only action as a trustee in any way related to the Trust was to contact the bonding company on March 23, 1979, to ensure that he was bonded as a trustee. Briody did nothing to determine what assets the Plan possessed or to protect the Plan from loss.

Mirus never returned the money invested with him and, in January, 1982, he pled guilty to charges stemming from a number of fraudulent transactions, including his dealings with Hodgman. Mirus also filed for bankruptcy. Gilbert-Hodgman and Hodgman filed for bankruptcy in March, 1983.

Based on these facts the court found that Hodgman's misuse of Plan assets and his investment of Plan assets with Mirus after the accountant warned against this were violations of his fiduciary duties under ERISA. The court also found that Briody was a trustee of the Plan as of March 15, 1979, and that his complete inaction violated his fiduciary duty to supervise and control the Plan assets. The court removed Hodgman and Briody as trustees, held both of them jointly and severally liable for three-quarters of the loss incurred by the Plan, and held Hodgman individually liable for the remaining loss, which occurred before Briody became a trustee. Finally, the court rejected Briody's claim for indemnification from Hodgman because of his "nonfeasance and misfeasance in failing to perform

his duties as a cofiduciary and trustee." The court later denied Briody's motion to reconsider denial of the cross-claim, noting that "[t]he concept of passive liability is not applicable to a trust relationship."

## II. TRUSTEE STATUS

Briody's first claim is that he cannot be held liable for breach of any fiduciary duty because he was not a trustee of the Plan when the losses occurred. Briody argues that the Plan was ineffective until the Internal Revenue Service held that it qualified under section 401(a) of the Internal Revenue Code, which did not happen until March 30, 1981. The basis of Briody's argument is Article XVI:3 of the Plan, which provides:

> Notwithstanding any provision of this Agreement to the contrary, no Participant or beneficiary shall have any right or claim to any asset of the Trust, nor to have such rights assigned or alienated, or to any benefit under the Plan before the Internal Revenue Service determines that the Plan and Trust qualify under the provisions of Section 401(a) of the Internal Revenue Code of 1954 as amended by the Employee Retirement Income Security Act of 1974, or any statute of similar import and the Trust shall have no liability with respect to any Participant or beneficiary before such determination of qualification by the Internal Revenue Service. The sole exception to this general provision is that the beneficiary of a Participant who dies prior to such determination of qualification by the Internal Revenue Service shall be entitled to the proceeds of any life insurance protection purchased by the Trustee from the Insurer which is in full force and effect on the life of such Participant at the date of death.

■ Briody argues that Article XVI:3 creates a condition precedent to the existence of a valid trust. While a valid condition precedent may delay the existence of a trust, *see Wynekoop v. Wynekoop*, 407 Ill. 219, 225, 95 N.E.2d 457, 460 (1950), to read Article XVI:3 as creating such a condition precedent would require us to strain the language of the provision, ignore the rest of the Plan, and reach an absurd result. Article XVI:3 acts only as a limitation upon the distribution of Plan assets. The obvious purpose is to ensure that disbursements are not made until the IRS certifies that the Plan is qualified for favorable tax treatment. This Article says nothing about relieving trustees of their duties prior to qualification, and in fact contemplates that the trustee will keep life insurance policies on the lives of some participants in force. It would be an odd result if a provision designed to protect Plan assets from improper distribution was read to relieve the trustees of any obligation to protect those same assets. In this regard we should note that the Plan makes no distinction between the duties of Hodgman and those of Briody, so that acceptance of Briody's argument would mean that there was no trustee in charge of the Plan assets. In addition, Briody's argument ignores the preamble to the Plan, which makes clear that the Plan was a continuation of the existing Plan and not a new Plan that would become effective at a later date, and Article XI of the Plan, which grants powers to the trustees regarding Plan assets immediately. In short, other than defendant's misreading of Article XVI:3, there is no support for his claim.

■ Finally, we view Briody's claim that he was unaware of his trustee status with some skepticism. In his brief, Briody claims that Hodgman informed him that he would not be a trustee until the Plan was qualified by the IRS. The district court did not find this to be a fact, and even if true it offers no protection to Briody. Briody may not rely on these misrepresentations to defeat his status as trustee in the face of the unambiguous language in the Plan to the contrary. In addition, Briody did not act as if he was unaware of his duties. Shortly after Briody signed the restated Plan he inquired of the bonding company to be sure that he was bonded as a trustee. Additionally, on March 19, 1981, Briody purportedly resigned as trustee, a resignation that the court later ruled was invalid. Thus, Briody

resigned his position eleven days before the date he now claims the position began. It appears to us that Briody was never in doubt as to his status as a trustee.

## III. BREACH OF FIDUCIARY DUTY

■ The court premised its conclusion that Briody was liable for the losses incurred by the Plan after March 15, 1979, on its finding that: "At no time after signing the Plan instrument ... did Defendant Briody take any action to determine the assets of the Plan to assert control over the Plan assets, or to insure that Plan assets would be protected from losses." The court found that this failure to exercise any control over Hodgman's activities violated Briody's duty as a trustee and contributed materially to the Plan's losses. His duty as a trustee at the very least should have prompted some inquiry on his part as to the propriety of his investment of trust funds. Briody now claims that the court's factual findings are insufficient to support its conclusion that Briody breached any duty under ERISA or that his inactivity contributed to the losses.

The circumstances under which a fiduciary may be liable for a co-fiduciary's breach are set forth in the Act. Section 1105(a) of ERISA provides that:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> \* \* \* \* \* \*
>
> (2) if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach.

Section 1105(b)(1) of ERISA provides that: "if the assets of a plan are held by two or more trustees—(A) each shall use reasonable care to prevent a co-trustee from committing a breach; and (B) they shall jointly manage and control the assets

of the plan." Section 1104(a)(1) requires that a trustee discharge his duties solely in the interest of the participants and "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man" would use.

Briody argues that he cannot be held liable under section 1105(a)(2) because he did not breach any duty under 1104(a)(1). Briody claims that he did not fail to discharge his duties with the requisite care, skill, and prudence because he was not a trustee and therefore not subject to these standards, or at the least was not aware of his trustee status. We have already rejected these arguments.

Once it is clear that Briody was a trustee it is also clear that he breached his duties under sections 1105(a)(2) and 1105(b)(1). Briody breached his duty to exercise "care, skill, prudence, and diligence" in dealing with the assets of the Plan. 29 U.S.C. § 1104(a)(1)(B). By failing to take any action with respect to the Plan, Briody enabled Hodgman to breach his fiduciary duties. Had Briody taken control of the assets he would quickly have realized that Hodgman was entrusting large sums of money to Mirus and might have investigated these investments himself or might have checked with the company's accountant, who had warned about giving money to Mirus previously. Prompt action could well have prevented Hodgman from giving $40,000 to Mirus. We are unpersuaded by Briody's claim that the majority of the losses occurred only four days after he became a trustee. First, this simply is not true. Hodgman withdrew the money four days after Briody became a trustee, but did not give it to Mirus until eleven days later. Briody had plenty of time to act to prevent this loss. Second, there is no grace period between the date one becomes a trustee and the date when one is expected actually to assume the duties of the office.

If we entertained any doubt that Congress intended to make Briody liable for this type of nonfeasance, it would be removed by the legislative history of the Act.

The joint explanatory statement of the Committee of Conference made clear that:

A fiduciary also is to be liable for the loss caused by the breach of fiduciary responsibility by another fiduciary of the plan if he enables the other fiduciary to commit a breach through his failure to exercise prudence (or otherwise comply with the basic fiduciary rules of the bill) in carrying out his specific responsibilities. For example, A and B are co-trustees and are to jointly manage the plan assets. A improperly allows B to have sole custody of the plan assets and makes no inquiry as to his conduct. B is thereby enabled to sell the property and to embezzle the proceeds. A is to be liable for a breach of fiduciary responsibility.

H.R.Rep. No. 1280, 93d Cong., 2d Sess., *reprinted in* 1974 U.S.Code Cong. & Ad. News 4639, 5038, 5080.

This example is exactly what happened in this case. Briody, having accepted a position as trustee, could not avoid liability for Hodgman's mismanagement of the Plan by simply doing nothing. ERISA does not make a trustee an insurer against a co-trustee's misconduct, but the Act does require the trustee to use reasonable care to prevent such a breach, 29 U.S.C. § 1105(b)(1)(A), or enter into an agreement allocating specific responsibilities among the trustees, in which case the trustee is not liable for a co-trustee's breach of his allocated duties. 29 U.S.C. § 1105(b)(1)(B). Briody did not enter into such an agreement, nor did he take any action either to object to or become aware of Hodgman's activities. Briody's nonfeasance was a breach of his duties under sections 1105(a)(2) and 1105(b)(1) of ERISA, and the court did not err in holding him liable for the resulting loss.

## IV. INDEMNITY

The district court rejected Briody's cross-claim for indemnity from Hodgman after finding that the "concept of passive liability is not applicable to a trust relationship and Briody may not avoid his liability to the trust or shift that liability to his co-trustee." Briody claims that the court erred in finding the concept of passive liability inapplicable to trust relationships and cites several authorities on trust law to support this claim. This, however, is not the issue. The proper question is not whether a right to indemnity exists under general principles of trust law, but whether such a right is provided by ERISA or the federal common law.

The Supreme Court recently examined and rejected similar claims under the Equal Pay Act of 1963, 29 U.S.C. § 201 *et seq.*, and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e), in *Northwest Airlines, Inc. v. Transport Workers Union of America*, 451 U.S. 77, 101 S.Ct. 1571, 67 L.Ed.2d 750 (1981), and under the antitrust laws in *Texas Industries, Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 101 S.Ct. 2061, 68 L.Ed.2d 500 (1981). In both *Northwest Airlines* and *Texas Industries* the Court made clear that a joint tortfeasor's right to contribution or indemnity must be found in the underlying statute or within the limited scope of the federal common law. *Northwest Airlines* 451 U.S. at 90, 101 S.Ct. at 1580; *Texas Industries*, 451 U.S. at 638, 101 S.Ct. at 2065. Briody admits that a right to indemnity from a co-trustee cannot be based upon the federal common law. The issue, then, is whether such a right can be found in ERISA.

Our task is not to determine whether recognition of a right to indemnity is wise or fair. Our inquiry is instead limited to determining whether Congress intended in any circumstances to create the remedy Briody seeks. This is a question of statutory construction that is answered by examining "the language of the statute itself, its legislative history, the underlying purpose and structure of the statutory scheme, and the likelihood that Congress intended to supersede or to supplement existing state remedies." *Northwest Airlines* at 91, 101 S.Ct. at 1580; *see also Cort v. Ash*, 422 U.S. 66, 78, 95 S.Ct. 2080, 2088, 45 L.Ed.2d 26 (1975). Whether ERISA allows a passive trustee to seek indemnification from a more culpable active trustee is not a wholly

new question for this court. We have previously recognized, albeit in dicta, that an ERISA fiduciary "may seek indemnification or contribution from co-fiduciaries." *Alton Memorial Hospital v. Metropolitan Life Insurance Co.*, 656 F.2d 245, 250 (7th Cir.1981). In *Freund v. Marshall & Ilsley Bank*, 485 F.Supp. 629, 635 (W.D.Wis. 1979), the court reached a similar result, once again in dicta, stating that a right to indemnification is within the equitable discretion of the court when faced with co-trustees liable under ERISA. We think that these cases reached the correct result, although they did so without explicitly applying the analysis set forth in *Northwest Airlines.*

That Congress did not provide an explicit right to indemnity is significant, but it is not dispositive "[i]f, among other things, the language of the statute[ ] indicates that [it was] enacted for the special benefit of a class of which petitioner is a member." If this is the case we may infer that Congress intended to provide class members with enforceable rights. *Northwest Airlines*, 451 U.S. at 91–92, 101 S.Ct. at 1580–1581. We believe that in the case of ERISA Congress intended to protect trustees from being ruined by the actions of their cofiduciaries, both because the language of ERISA provides protection for co-trustees and because Congress evidenced an intent to apply general trust principles to the trustee provisions of ERISA.

We must begin our analysis with the language of the statute. Although the declared policy of the Act is "to protect interstate commerce and the interests of participants in employee benefit plans and their beneficiaries," 29 U.S.C. § 1001(b); *see also* H.R.Rep. No. 533, 93d Cong., 2d Sess., *reprinted in* 1974 U.S.Code Cong. & Ad. News 4639, the provisions of ERISA also extend protection to trustees serving as co-trustees of a plan. Section 1105 of the Act relieves a trustee of liability for a co-trustee's breach of fiduciary duty by limiting co-fiduciary liability to those circumstances set forth in 1105(a), and also by allowing trustees to allocate explicitly responsibilities for various functions and

thereby avoid liability for breaches of duties allocated to another trustee. 29 U.S.C. § 1105(b)(1)(B). Congress clearly did not intend trustees to act as insurers of co-trustees' actions, and the only question that remains is whether a co-trustee who has not availed himself of the protection of section 1105, and has therefore been required to make good a loss to a plan, can nonetheless recoup his loss from his more culpable co-trustee. We believe that ERISA allows such an action in narrowly appropriate circumstances.

Section 1132(a) of the Act provides that: "A civil action may be brought ... (2) by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief under section 1109 of this title." Section 1109 provides that:

(a) Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

■ The issue, then, is whether the indemnity Briody seeks is within the appropriate equitable relief he may seek under section 1109. In our opinion ERISA grants the courts the power to shape an award so as to make the injured plan whole while at the same time apportioning the damages equitably between the wrongdoers. An award of indemnification within the limited circumstances of this case appears to us to be properly within the court's equitable powers.

Our reading of section 1109 is based upon the legislative history of ERISA, which demonstrates that Congress intended to codify the principles of trust law with whatever alterations were needed to fit the

needs of employee benefit plans. See H.R. Rep. No. 533, *supra,* at 4651; S.Rep. No. 127, 93d Cong., 2d Sess., *reprinted in* 1974 U.S.Code Cong. & Ad.News 4838, 4865; *Freund v. Marshall & Ilsley Bank,* 485 F.Supp. 629, 641–42 (W.D.Wis.1979) (ERISA makes applicable the traditional trust law principle that non-fiduciaries who participate in a breach of trust may be liable). General principles of trust law provide for indemnification under the appropriate circumstances.

In enforcing the liabilities of co-trustees equity considers where the burden shall ultimately fall, in view of the part which each trustee took in the transaction. If one trustee is solely or principally active in the commission of the breach, and the other trustee was passive or only nominally a participant, the court may, in the exercise of its discretion, grant the latter a right of indemnity against the former and throw the entire burden on him who was most blameworthy.

G. Bogert, Trusts & Trustees § 862 (2d ed. 1962); *see also* Restatement (Second) of Trusts § 158 (1959).

Briody quite apparently trusted, although the trust was misplaced, his longtime friend and business customer. He also apparently assumed, again mistakenly, that he was being named as a trustee because of a requirement of the law that there be a second trustee named. Although it does not excuse him from personal liability, he was a nominal trustee whose fault was nonfeasance. In essence, he was a bystander although, under the applicable law designed to protect beneficiaries, he was not an innocent one.

Appellee Free argues that even if indemnification is allowable here, it should not be granted because it may affect his ability to collect from Hodgman. We note that Briody will not be entitled to collect anything from Hodgman until he has paid Free, and so the amount owed to Briody will equal the amount already paid to Free. To the extent Briody's claim might adversely affect Free, the court on remand may shape its award to protect Free from any loss resulting from Briody's claim against Hodgman.

The district court here incorrectly concluded that Briody could not seek indemnity from Hodgman. For the reasons stated herein we affirm the judgment of the district court with the exception of that part pertaining to Briody's cross-complaint, which part is vacated. Because the record is not fully developed on this aspect of the case, we remand as to this issue for appropriate action in accordance with this opinion.