In re BURLINGTON NORTHERN, INC. EMPLOYMENT PRACTICES LITIGATION.

Appeal of Paul C. SPRENGER, et al., Lead Counsel-Appellants.

Appeal of William E. McBRIDE, et al., Plaintiffs-Appellants.

Appeal of AMERICAN TRAIN DIS-PATCHERS ASSOCIATION, AFL–CIO, et al., Defendants-Appellants.

Nos. 85–2898, 85–3087.

United States Court of Appeals, Seventh Circuit.

Argued May 16, 1986.

Decided Oct. 2, 1986.

Lee Freeman, Chicago, Ill., Michael S. Wolly, Mullholland & Hickey, Washington, D.C., Harold A. Ross, Ross & Kraushaar, Cleveland, Ohio, for appellants.

Christopher T. Lutz, Steptoe & Johnson, Washington, D.C., for Burlington Northern.

Before CUDAHY and FLAUM, Circuit Judges, and CAMPBELL, Senior District Judge.*

FLAUM, Circuit Judge.

This appeal involves two issues left unresolved after the settlement of a multi-million-dollar Title VII race discrimination class action against the Burlington Northern railroad and its unions. The district court in Chicago certified the class, composed of black employees throughout the BN system, in 1978, and in 1979 the Judicial Panel on Multidistrict Litigation consolidated in Chicago all the Title VII race discrimination cases pending against BN in several districts. The district court appointed as lead counsel for plaintiffs the Minneapolis firm of Sprenger, Olson & Shutes and the Chicago firm of Davis, Miner, Barnhill & Galland. After years of preparation and discovery, the case was settled a few hours before trial was to begin on November 7, 1983. The settlement, as embodied in a consent decree, provided injunctive relief and created a fund of $10 million for back pay compensation, as well as providing that plaintiffs' counsel would be paid reasonable fees. This fees provision is the basis for the two issues presented in this action: (1) what is a reasonable fee and (2) who among the defendants shares responsibility for paying the fees. The lead law firms appeal the district court's refusal to award them anything above the "lodestar" figure, obtained by multiplying their reasonable hours by reasonable hourly rates, plus post-judgment interest. The unions appeal the district court's order requiring them to contribute to BN's payment of the lead counsel's fees. We affirm both of the district court's rulings, although we reverse a minor part of the district court's order concerning the apportionment of the fees awarded.

## I. FACTS.

A. *The Consent Decree.* The class action against BN involved claims of discrimination in hiring, discipline, discharge, assignment, and promotion, and the defendants mounted a vigorous defense to the case. Many of the plaintiffs' discovery requests were opposed, *see In Re Burlington Northern, Inc.,* 679 F.2d 762 (8th Cir. 1982), and plaintiffs' lead counsel alone (there were additional counsel pursuing "tagalong" cases and representing the intervening EEOC) expended some 12,228 hours and 5,158 hours of paralegal time in prosecuting the action. The relief provided by the consent decree was extensive. In addition to the $10 million fund, which was to be paid out to claimants who could establish that they had been subjected to racial discrimination in hiring, promotion, or discharge, the decree bound Burlington Northern to a wide range of injunctive measures, including hiring and promotional requirements, references for discharged employees, seniority protection for promoted employees, and training programs.

The last provision of the consent decree provided the following:

> Counsel for private plaintiffs and EEOC shall be paid their costs including experts' fees, and including (except as to EEOC) reasonable attorneys' fees, on all issues involved in this litigation, determined as follows. The parties shall meet and attempt to agree upon the amount of such fees and costs within fourteen days of the entry of the decree. Counsel for plaintiffs and EEOC will to the extent feasible identify the portion of their costs and fees chargeable to the scheduled transfer and promotion or craft seniority

* The Honorable William J. Campbell, Senior District Judge for the Northern District of Illinois, is sitting by designation.

issue. In the event the parties are unable to agree in whole or in part within an additional 30 days, any unresolved issues, including any issue as to the apportionment of those costs and fees among all defendants, shall be presented to the court for resolution upon petition of counsel for plaintiffs and EEOC. BN and the unions may litigate the amount of the costs and fees sought.

BN will not dispute the entitlement of counsel for private plaintiffs and EEOC to reasonable costs, including (except as to EEOC) reasonable attorney's fees, as provided above, on any issue but may seek apportionment of those costs and fees among all defendants or contribution from the unions for an allocable portion of those costs and fees.

The defendant unions do not agree that private plaintiffs and EEOC are entitled to any costs and fees from them. The defendant unions may make whatever objections they deem appropriate to the private plaintiffs' and EEOC's petition as well as to any effort by BN to secure apportionment or contribution for an allocable portion of those costs and fees.

The decree was signed by counsel for plaintiffs, BN, the EEOC, and the unions on November 21, 1983 and was formally approved by the court on April 2, 1984.

B. *The Attorneys Fees Action.* The EEOC and "tagalong" counsel came to an agreement with BN and the unions whereby they would receive nearly $1 million in fees and costs. The two lead counsel were unable to settle with the defendants on the issue of fees, however, and filed petitions for fees and costs with the district court. The petitions documented some $1.1 million in advanced expenses, and the district court ordered BN to pay this sum "subject to its right to seek contribution from the union defendants." As to fees, the lead counsel presented a "lodestar" figure of $2,184,-165.50, which represented 12,228.2 attorney hours and 5,157.8 paralegal hours multiplied by various hourly rates. Lead counsel sought interest on this figure from the date of the consent decree's approval.

Counsel further requested that the lodestar figure be subjected to a multiplier of 2.5 for the attorney fees, bringing the total fees requested to $4,981,145.00, plus interest. BN conceded that the hours expended were reasonable, but objected to the hourly rates requested by the lead counsel and to the use of a multiplier. BN further claimed that lead counsel were not entitled to interest on the fees from April 2, 1984, the date of the consent decree's final approval. Finally, BN requested that the district court order the defendant unions to assume responsibility for some portion of the fees and costs.

The district court received briefing and affidavit testimony regarding these remaining disputes, and it issued an opinion on September 20, 1985. The district court found that the requested hourly rates were reasonable, given that "the object of a fee determination is to simulate the results which would be obtained if the lawyer involved were dealing with a paying client." The district court noted that as to each lawyer involved, "there is evidence that the hourly rates requested have either been paid by clients or awarded to them by a court in the past," and that "[t]he requested rates approximate, as close as these matters can, the prevailing ones paid to comparable attorneys in the relevant community." The total lodestar fee of $2,184,-165.50 thus was awarded, along with interest from the date of the "order entered in accordance with this memorandum." The district court concluded that interest should not be calculated from the date of the decree's approval, since prejudgment interest was not merited and would be "grossly unfair" to BN.

The district court further declined to apply a multiplier to the lodestar figure. The lead counsel had argued that the exceptional success they achieved, and the extreme risk they undertook in representing the plaintiff class, merited upward adjustment of the fee award, and that multipliers are necessary in order to attract sufficient numbers of counsel to represent Title VII plaintiffs. The district court undertook a

review of the applicable Supreme Court precedent involving fee-shifting provisions in civil rights laws, as well as case law from the circuits, and noted that one factor in the determination of whether to apply a multiplier is "exceptional success." *Hensley v. Eckerhart*, 461 U.S. 424, 435, 103 S.Ct. 1933, 1940, 76 L.Ed.2d 40 (1983) ("Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee. Normally this will encompass all hours reasonably expended on the litigation, and indeed in some cases of exceptional success an enhanced award may be justified."). The district court went on to acknowledge that the later case of *Blum v. Stenson*, 465 U.S. 886, 898, 104 S.Ct. 1541, 1548, 79 L.Ed.2d 891 (1984), clearly burdened the fee applicant with proving that an upward adjustment was necessary in order to obtain a reasonable fee. The district court went on to review the evidence submitted by the parties and found that the lead counsel had failed to establish that the success they had achieved was so "rare or uncommon" as to warrant a multiplier.

In addition to identifying exceptional success as a factor in its determination, the district court evaluated the lead counsel's argument that the *ex ante* risk they took in undergoing the representation was so great that the lodestar had to be adjusted upward in order to compensate them fully *ex post.* The district court concluded that although the risks of Title VII litigation may be relevant to the fee determination, the lead counsel had not met their burden of demonstrating that anything beyond the general risks of litigation were present at the outset of this class action. The district judge found that counsel's evidence concerned merely the difficulties associated with preparing any big case for trial, as opposed to the kind of risk warranting greater-than-lodestar compensation. Distinguishing the case of *Thompson v. Sawyer*, 678 F.2d 257 (D.C.Cir.1982), in which a multiplier had been awarded, the district court pointed out that the *Thompson* plaintiffs had relied on a new theory of discrimination and a new form of remedy for their success, and had created a new rule of law in the process. Since the district court found that the BN litigation involved none of these features, it held that the kind of risk warranting the use of a multiplier was not present. The court also found incredible the lead counsel's evidence claiming that the risks of Title VII litigation in general were such that multipliers were necessary in order to attract competent counsel. As a final factor in its decision to deny a multiplier, the district court commented that in its award of a full lodestar, it had granted top current hourly rates for all of the hours that counsel had expended during the six years of litigation, even though during many of those years of litigation, they could not have commanded those rates. As a result, the district court was convinced that it had awarded a fully compensable fee.

On the final issue of the unions' contribution to the lead counsel's fees and costs, the district court found that: (1) the consent decree contemplated that BN would seek contribution from the unions, which preserved their rights to object; (2) Title VII case law does not prohibit contribution from defendant unions and in fact provides numerous examples of such an allocation of attorneys fees and costs; and (3) the plaintiffs obtained enough success in seniority-related issues against the unions to be considered "prevailing parties" as to them. Accordingly, the district court ordered that fifty percent of fees and costs clearly attributable to seniority-related issues be borne by the unions, as well as ten percent of the remaining fees and costs.

In its conclusion, the district court summarized its order and added one provision: the lodestar fees were to be distributed to the attorneys and paralegals in the amounts listed in the fee petitions. This appeal by the lead counsel and the unions followed.

## II. TIMELINESS OF THE APPEALS.

■ Before we reach the merits of the appeals, we must address BN's assertion

that the appeals should be dismissed because both the lead counsel and the unions failed to file their notices of appeal within the thirty-day period period mandated by Rule 4(a)(1) of the Federal Rules of Appellate Procedure. It is true that lead counsel filed their notice of appeal on October 28, 1985, thirty-eight days after the district court's September 20 decision, 618 F.Supp. 1046, and that the unions filed their notice on November 27, 1985, thirty-three days (*see* Rule 4(a)(4)) after the district court on October 25 denied their motion to alter or amend the September decision. Nevertheless, we find that both appeals are timely.

Rule 4(a)(1) has a special sixty-day rule for cases in which the United States is a party: "if the United States or an officer or agency thereof is a party, the notice of appeal may be filed by any party within 60 days." Since the EEOC was a party in the class action against BN, a signatory to the consent decree, and remains a party to the decree-monitoring proceedings in the district court, it clearly has a sufficient interest in the action to be a "party" for purposes of Rule 4(a)(1). *See, e.g., United States v. American Society of Composers, Authors & Publishers (ASCAP)*, 331 F.2d 117, 119–20 (2d Cir.) (distinguishing situation in which consent decree gives United States a continuing role in action from situation in which United States has "long since become a merely nominal party"), *cert. denied*, 377 U.S. 997, 84 S.Ct. 1917, 12 L.Ed.2d 1048 (1964). Moreover, the fact that the United States was not *directly* concerned with the particular decision appealed (the EEOC definitely has a *policy* interest in attorney fee awards in Title VII actions) is irrelevant. *See, e.g., ASCAP,* 331 F.2d at 119 ("[t]he stated criterion is whether the United States is a party to the action, ... and not whether the United States is concerned with the particular order sought to be appealed—something that often cannot be accurately determined when the order is made"); *see also, e.g., Rochester Methodist Hospital v. Travelers Insurance Co.*, 728 F.2d 1006, 1011–12 (8th Cir.1984); *In re Paris Air Crash of March 3, 1974*, 578 F.2d 264, 265 (9th Cir.1978).

Thus, the sixty-day period of Rule 4(a)(1) is applicable, and the appeals are timely.

## III. LEAD COUNSEL'S FEES.

The lead counsel appeal four aspects of the district court's decision. First, they argue that the exceptional success they achieved in the litigation merits a multiplier, and that the district judge erred by comparing their success only to other cases of exceptional success. Second, they assert that the district court erred when it refused to award them a multiplier to compensate them for the risk of not prevailing, and they believe this error is grounded in the court's alleged decision that risk analysis is irrelevant to multiplier determinations and on an erroneous finding that lead counsel had not proved by specific evidence that they were entitled to a risk multiplier. Third, lead counsel claim that the district court's order erroneously left them uncompensated for the delay in payment. Finally, they urge us to reverse the district court's order requiring that the fees be paid to the attorneys and paralegals in the amounts listed in the fee petitions. For the reasons we discuss below, we affirm the district court on the first three of these issues and reverse that portion of the district court's order directing payment of the award to the firms' attorneys and paralegals.

■ A. *The "exceptional success" multiplier.* Since oral argument in this case, the Supreme Court has issued a minor opinion relating to the proper use of multipliers in fee-shifting situations, *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, —— U.S. ——, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986). *Delaware Valley* involved attorneys fees under the Clean Air Act, 42 U.S.C. § 7401 *et seq.*, which, like Title VII, contains a fee-shifting provision authorizing awards of reasonable attorneys fees. In the underlying litigation, the Delaware Valley Citizens' Council filed suit to compel Pennsylvania to implement a vehicle emission inspection and maintenance program. The parties

eventually entered into a consent decree and Delaware Valley sought attorneys fees and costs. The district court calculated the lodestar figure by multiplying reasonable hours by reasonable hourly rates. It then applied a multiplier based on the risk of not prevailing and on "superior" work that " 'culminated in an outstanding result.' " 106 S.Ct. at 3088, quoting the district court's opinion, 581 F.Supp. 1412, 1431 (E.D.Pa.1984). The Court of Appeals for the Third Circuit affirmed, saying with respect to the exceptional success factor that "this was 'the rare case where the fee applicant offer[ed] specific evidence to show that the quality of service rendered was superior to that one reasonably should expect in light of the hourly rates charged and that the success was exceptional.' " 762 F.2d 272, 280 (3d Cir.1985), quoting *Blum v. Stenson*, 465 U.S. 886, 899, 104 S.Ct. 1541, 1549, 79 L.Ed.2d 891 (1984).

The Supreme Court reversed the exceptional success multiplier, but set the risk multiplier issue for reargument, as we discuss in the next section. The Court's position on the use of multipliers to reward exceptional success leaves little doubt that this factor is disfavored. The Court reiterated the position it took in *Blum* that "the proper first step in determining a reasonable attorney's fee is to multiply "the number of hours reasonably expended on the litigation times a reasonably hourly rate.' " 106 S.Ct. at 3098, quoting *Blum*, 465 U.S. at 888, 104 S.Ct. at 1543. The Court reemphasized that the resultant figure is "more than a mere rough guess or initial approximation of the final award to be made. Instead, ... '[w]hen ... the applicant for a fee has carried his burden of showing that the claimed rate and number of hours are reasonable, the resulting product *is presumed* to be the reasonable fee' to which counsel is entitled." *Id.* at 3098, quoting *Blum*, 465 U.S. at 897, 104 S.Ct. at 1548.

The Court enunciated two rationales for this presumption. The first is that fee-shifting provisions ordinarily are not meant to provide a windfall to attorneys or to "replicate exactly the fee an attorney could earn through a private fee arrangement with his client." *Id.* at 3098. Rather, the aim of fee-shifting statutes is to enable private parties to obtain legal counsel. The Court concluded that since Delaware Valley "was able to obtain counsel without any promise of regard for extraordinary performance," the purpose of the Clean Air Act's statutory fee provision was satisfied. *Id.* at 3099.

The second rationale for presuming that the lodestar constitutes a reasonable fee is that "when an attorney first accepts a case and agrees to represent the client, he obligates himself to perform to the best of his ability and to produce the best possible results commensurate with his skill and his client's interests. Calculating the fee award in a manner that accounts for these factors, either in determining the reasonable number of hours expended on the litigation or in setting the reasonable hourly rate, thus adequately compensates the attorney, and leaves very little room for enhancing the award based on his post-engagement performance." *Id.*

In the face of this strong presumption that the lodestar figure encompasses the factor of performance, we will not reverse as an abuse of discretion the district court's refusal to award a multiplier based on exceptional success. *See Evans v. Jeff D.,* — U.S. ——, 106 S.Ct. 1531, 1542 & n. 26, 89 L.Ed.2d (1986). The district court found that the success in this case did not replicate that of other, pre-*Delaware Valley,* cases in which multipliers had been awarded, and although we have nothing but admiration for the lead counsel's performance, we cannot disturb that finding. Moreover, the hourly rates granted lead counsel were, in the words of the district court, "the top they can request," and all of counsel's requested hours were awarded. Thus, lead counsel were given the top current billing rates for every hour they expended on the litigation—clearly, in light of *Delaware Valley,* a fee that fully compensates them for their fine work and successful results. Finally, one can question whether enhancement for exceptional suc-

cess is *ever* appropriate. "[T]he lodestar figure includes most, *if not all,* of the relevant factors comprising a 'reasonable' attorney's fee, and it is unnecessary to enhance the fee for superior performance in order to serve the statutory purpose of enabling plaintiffs to secure legal assistance." *Delaware Valley* 106 S.Ct. at 3098–99 (emphasis added). We accordingly affirm the district court's refusal to award a multiplier for exceptional success.

■ B. *The risk multiplier.* In *Delaware Valley,* the Supreme Court expressly left undecided the question of upward adjustment of the lodestar in order to compensate for the risk of loss, a question it has also declined to decide in *Blum.* The Court noted that the circuits were not in complete agreement on the issue, and it set the case for reargument. Until it issues an opinion on that question, therefore, we are left with some uncertainty regarding the wisdom of risk multipliers. Existing Supreme Court precedent, however, emphasizes that the lodestar figure is the *presumptively* reasonable attorneys fee and thus does not encourage us to find that the district court abused its discretion in denying a multiplier. *See Delaware Valley,* 106 S.Ct. at 3098; *City of Riverside v. Rivera,* — U.S. —, 106 S.Ct. 2686, 2696, 91 L.Ed.2d 466 (1986) ("In order to ensure that lawyers would be willing to represent persons with legitimate civil rights grievances, Congress determined that it would be necessary to compensate lawyers for all time reasonably expended on a case."); *Blum,* 465 U.S. at 901, 104 S.Ct. at 1550.

Nevertheless, we have noted that "[o]nly by offering to pay the lawyer his opportunity wage, the compensation he could obtain by representing paying clients, may a court induce the lawyer to take civil rights cases." *Kirchoff v. Flynn,* 786 F.2d 320, 326 (7th Cir.1986). This opportunity wage may be difficult to derive using hourly rates as the basis, because hourly rates usually are those "fees that lawyers charge to clients who pay promptly when billed." *Id.* Payment pursuant to fee-shifting statutes, however, is contingent on

success in the litigation and is delayed until after the underlying litigation is over, two characteristics that normally are not factored into hourly rates. One way to attempt to compensate attorneys fully, therefore, is to multiply the lodestar. We noted in *Kirchoff,* however, that such an adjustment is artificial and problematic: "[o]ne common concern with compensation for risk is that the multiplier should rise as the probability of success falls, soaking the unlucky defendant who had a good case ... but lost anyway and therefore faced a huge multiplier." *Id.* Conversely, risk multipliers may reward lawyers for bringing unmeritorious litigation. *See McKinnon v. City of Berwyn,* 750 F.2d 1383, 1392 (7th Cir.1985). For these reasons, this circuit has not favored the use of risk multipliers. *See, e.g., id.; Bonner v. Coughlin,* 657 F.2d 931, 936 (7th Cir.1981) (per curiam).

With this case law in mind, we will not find that the district court abused its discretion in awarding only the lodestar. Even in the absence of questions concerning the propriety of risk multipliers, we would consider dispositive the district court's finding that this case involved factual complexities and difficulties of trial preparation, but not the kind of significant risk engendered by having to rely on new legal theories of recovery or new remedies. *See Kamberos v. GTE Automatic Electric, Inc.,* 603 F.2d 598, 604 (7th Cir.1979). Moreover, lead counsel in fact received some compensation over and above that which they would have received from a regular paying client, since they were compensated for *all* their hours at current rates that they would not have been able consistently to charge over the six-year span of the litigation, a factor that also mitigates the delay in payment, as we discuss below. For these reasons, we affirm the district court's refusal to apply a risk multiplier to the fee award.

■ C. *Interest as compensation for delay in payment.* Lead counsel sought interest on the fee award from the April 1984 approval of the consent decree in or-

der to compensate them for the delay in payment. Counsel argue that since they submitted fee petitions in June of 1984 and based their figures on then-current hourly rates, they were uncompensated for the delay between that date and September 1985, when the district court entered its decision and order. While we are concerned with the delays that counsel in these kinds of cases face when litigating fee awards, we are bound by the statutory presumption that interest on money judgments "shall be calculated from the date of the entry of the judgment." 28 U.S.C. § 1961(a). While this statute does not preclude prejudgment interest, the award of such interest is committed to the discretion of the district court and is to be based on equitable considerations. *See, e.g., Michaels v. Michaels,* 767 F.2d 1185, 1204 (7th Cir.1985).

Here, the delay in judgment was occasioned by a legitimate dispute over several issues, notably the question of fee multipliers. BN vigorously asserted that lead counsel were not entitled to the award of a multiplier, and in light of our holding, their position was not a vexatious or unreasonable one. The district court found that it would be "grossly unfair" to penalize BN for asserting a defense to the lead counsel's request, and we cannot characterize this decision as an abuse of discretion.

Moreover, lead counsel may have been compensated, at least in part, by the fact that they were paid at the top 1984 hourly rates for all of the work they performed throughout the litigation. We have noted that "if the fee award was based upon prevailing hourly rates, as opposed to those in effect at the time services were rendered, any harm resulting from the delay would be greatly diminished or altogether eliminated." *Bonner,* 657 F.2d at 937. In the absence of evidence, we have no basis on which to conclude that payment based on 1984 rates compensated lead counsel only for the delay in payment up to that time; in fact, it may also have ameliorated the delay from June 1984 to September 1985. We therefore will not reverse the district court's refusal to order interest from the date of the consent decree's approval.

■ D. *Apportionment of fee award.* In the last part of its decision, the district court ordered that the individual attorneys and paralegals in the lead counsel's firm be paid the amounts shown in the fee petitions. According to the judge's order, for example, an associate whose lodestar figure came to $140,000 would receive that sum from the fee award. This amount represents a billing rate of $110 per hour, a rate that we can assume with some confidence is not equivalent to what the attorney earns on an hourly basis. Law firms, like other businesses that sell time, must set their hourly rates at an amount greater than that needed to pay their attorneys' or paralegals' salaries; they must figure into those rates all their costs of doing business. A reasonable hourly rate for purposes of a fee award, therefore, is not the same as reasonable compensation for an individual attorney, and we therefore reverse this portion of the district court's order and direct that the award be paid to the respective law firms, not the individual attorneys and paralegals.

## IV. THE UNIONS' CONTRIBUTION.

The district court ordered that the thirteen union defendants should assume responsibility for some portion of the fees and costs awarded to lead counsel, and it granted BN contribution from the unions in the following manner: fifty percent of the fees and expenses clearly attributable to seniority-related issues was allocated to the unions, as well as ten percent of fees and expenses not clearly attributable to seniority-related issues. The unions thereafter filed a motion pursuant to Rule 59(e) of the Federal Rules of Civil Procedure, requesting that the district court modify its order to the extent that the unions not be required to contribute ten percent of the fees and expenses attributable to issues concerning hiring, discipline, and discharge, since the consent decree provided that BN was to bear full responsibility for fees and

**610**

expenses relating to these issues. The district court denied this motion and the unions now appeal, asserting as grounds for reversal: (1) their alleged immunity from liability for any portion of the lead counsel's fees and expenses; and (2) the district court's alleged error in denying their Rule 59(e) motion. We are unconvinced that either of these grounds merits reversal, and we therefore affirm the district court's decision.

■ A. *Immunity from liability.* The unions argue that under the rule of *Northwest Airlines v. Transport Workers Union of America,* 451 U.S. 77, 101 S.Ct. 1571, 67 L.Ed.2d 750 (1981), BN has no right of contribution from the unions. We cannot agree that *Northwest Airlines* extends that far. The Court there held that an employer has no federal statutory or common law right of contribution from a non-defendant union, 451 U.S. at 94, 98, 101 S.Ct. at 1582, 1584, but the Court clearly did not preclude recovery from a union that was a named defendant in a Title VII action. Such a reading of *Northwest Airlines* ignores the Court's explicit statement that "[a] court's broad power under [Title VII] . . . to fashion relief against all respondents named in a properly filed charge [was] not at issue in this litigation since no charge was filed against either of the respondent unions." *Id.* at 93 n. 28, 101 S.Ct. at 1581 n. 28. The unions have not presented a persuasive argument for limiting the district court's power to award attorneys fees to the prevailing party in this case and to require all of the named defendants to share the responsibility for those fees. Accordingly, we find that nothing in the statute or case law prohibits the order of contribution.

The unions also claim immunity from liability for a portion of the fees because lead counsel addressed their fee petitions to BN, and not to the unions. We agree with the district court that the consent decree clearly provided for the procedural events that transpired here. The decree states that "BN . . . may seek apportionment of those costs and fees among all defendants or contribution from the unions." The decree further provided that the unions preserved their right to object to the fee petitions "as well as to any effort by BN to secure apportionment of contribution." This language contemplates, as the district court found, that "fees and expenses would be sought from Burlington; that the railroad would then seek apportionment among and contribution from the unions; and that the unions preserved the right to object to any apportionment or contribution." We therefore cannot find the unions immune from liability for a portion of the prevailing party's attorneys fees.

■ B. *The Rule 59(e) motion.* The unions moved the district court, pursuant to Rule 59(e), to alter or amend its order requiring the unions to pay, in addition to fifty percent of the seniority-related fees and expenses, ten percent of fees and expenses unattributable to seniority issues. The unions based their argument on the consent decree, which states in an addendum that "BN will not seek apportionment of or contribution towards the costs and fees relating to the issues [of hiring, discipline, or discharge] from the unions." The district court denied this motion, in part because of its finding that the unions had waived this argument by not bringing it before the court in the underlying contribution proceeding. The unions' failure to make its argument to the district court at the appropriate time was a fatal error. BN's request for contribution from the unions contained a detailed calculation by attorney and firm of how much the unions would have to pay under the proposed ten percent formula. The unions failed to counter with their own calculation of a proper allocation; instead, they waited until they filed the Rule 59(e) motion to present figures to the district court. Although the district court obviously was aware of the language of the consent decree addendum, the unions could not expect to wait until *after* the court issued its judgment to make an argument based on that language. We agree, therefore, that the unions waived whatever argument they

may have had regarding the ten percent allocation. Accordingly, we affirm the district court's order requiring contribution.

## V.

For the reasons stated above, the district court's order of September 20, 1985 is AFFIRMED, with the exception of that portion directing payment of the fees award to the attorneys and paralegals in the amounts listed in the fee petitions. That portion of the district court's order is REVERSED in accordance with our opinion above.

## ORDER

In denying this petition for rehearing, we wish to emphasize that our holding was a narrow one. We held only that, in light of recent Supreme Court precedent, the district court's failure to apply a multiplier to the appellants' fee award in order to compensate them for the risk of losing the case was not an abuse of discretion.

The Supreme Court appeared to be open to the concept of risk compensation in *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). In *Hensley*, the Court stressed that "[t]he product of reasonable hours times a reasonable rate does not end the inquiry. There remain other considerations that may lead the district court to adjust the fee upward or downward, ..." 461 U.S. at 434, 103 S.Ct. at 1940. Justices Brennan, Marshall, Blackmun, and Stevens, concurring in part, were more explicit, stating that a district court awarding fees should "consider both delays in payment and the prelitigation likelihood that the claims which did in fact prevail would prevail." *Id.* at 449, 103 S.Ct. at 1947.

However, the Court retreated from this position in *Blum v. Stenson*, 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984). In *Blum*, the Court held that the lodestar amount, rather than being a mere "rough guess" or initial approximation of the final

award, should be *presumed* to be the reasonable fee. *Id.* at 897, 104 S.Ct. at 1548. The Court stated that a district court should make upward adjustments to the lodestar amount only in "the rare case where the fee application offers specific evidence to show that the quality of service rendered was superior to that one reasonably should expect in light of the hourly rates charged and that the success was 'exceptional.'" *Id.* at 899, 104 S.Ct. at 1549. *Blum* expressly left open the question of whether the risk of not being the prevailing party could ever justify an upward fee adjustment. 465 U.S. at 901 n. 17, 104 S.Ct. at 1550 n. 17. As we noted in the opinion, the Supreme Court has called for re-argument in *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, ___ U.S. ___, 106 S.Ct. 3088, 3100, 92 L.Ed.2d 439 (1986), on this question.

In this case, the district court did not find that the plaintiffs' success was exceptional within the meaning of *Blum*, and in the absence of evidence to demonstrate that this finding was an abuse of discretion, we were constrained to follow *Blum* and affirm the district court's judgment. In so deciding, we did not address whether the lodestar amount should ever be adjusted upward to compensate for the risk of loss. Neither did we address whether, assuming this type of adjustment is legitimate, the use of a multiplier is an appropriate means to achieve this purpose. These questions remain open in our circuit. *See Kirchoff v. Flynn*, 786 F.2d 320, 326 (7th Cir.1986). We look to the decision in *Delaware Valley* to shed more light on this area.

On consideration of the petition for rehearing and suggestion for rehearing *en banc* filed in the above-entitled cause by attorneys for plaintiffs-appellants, no judge in active service has requested a vote thereon,* and all of the judges on the original panel have voted to deny a rehearing. Accordingly, it is ordered that the aforesaid

---

* The Honorable Frank H. Easterbrook, Circuit Judge, did not participate in the consideration of this petition for rehearing.

petition for rehearing be, and the same is hereby, denied.